# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. JEREMY STEPHEN PARKS

### Appeal from the Blount County Circuit Court
### No. C-17493    David Reed Duggan, Judge

### No. E2009-01984-CCA-R3-CD - Filed February 23, 2011

The Defendant, Jeremy Stephen Parks, pled guilty to sexual exploitation of a minor, a Class D felony. See T.C.A. § 39-17-1003 (2010). He was sentenced as a Range I, standard offender to four years' confinement, with six months to be served in the Blount County Jail and the remainder to be served on supervised probation with multiple special conditions. On appeal, he contends that the trial court erred during sentencing by (1) denying judicial diversion, (2) imposing the maximum sentence in the range and ordering confinement, and (3) imposing unreasonable terms of probation. We affirm the conviction and the length of the Defendant's sentence, but we modify the special conditions of probation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal), and Stacey Nordquist, Assistant Public Defender (at trial), for the appellant, Jeremy Stephen Parks.

Robert E. Cooper, Jr., Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; Mike Flynn, District Attorney General; and Stephen Ogle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the Defendant's possession of videos and photographs that depicted minors engaged in sexual activity. At the guilty plea hearing, the Defendant stipulated that on December 18, 2006, he possessed materials depicting minors under eighteen years of age engaged in sexual activity.

At the sentencing hearing, Mary Barker testified that she was a senior psychological examiner approved by the Tennessee Sex Offender Treatment Board to treat patients. She said she had conducted psychosexual evaluations for about six years. She said that she performed a psychosexual evaluation of the Defendant and that she based her evaluation on information provided by the Defendant, a presentence report, and telephone conversations with the Defendant's therapist and the officer who monitored the Defendant's conduct for the Sex Offender Registry. She said she administered tests on the Defendant designed to reveal sexual history and attitudes, deviant behavior, and personality disorders. She said the tests indicated that the Defendant had an avoidant personality disorder. She agreed that the tests designed to reveal sexual history and sexual attitudes were based upon patient responses and that there were no objective criteria to confirm the accuracy of those responses. She said she contacted collateral sources, such as a patient's therapist, to confirm the accuracy of patient responses. She said she did not use a polygraph to evaluate the Defendant.

Ms. Barker testified that she did not know what sexually stimulated the Defendant because she did not use a penile plethysmograph to evaluate him. She explained that a penile plethysmograph is a device used to measure a person's response to different sexual stimuli. She agreed that some members of the Tennessee Sex Offender Board recommended the use of a plethysmograph to evaluate a patient but said that one was not available to evaluate the Defendant. She said that a pornography collection may indicate a person's sexual desires and that the Defendant possessed a large quantity of child pornography. She said her ultimate diagnosis of the Defendant was that he suffered from impulse control disorder. She said the Defendant was not diagnosed with paraphilia, a desire to engage in deviant sexual behavior, or pedophilia, a sexual preference for children.

Ms. Barker testified that the Defendant was a low risk to re-offend. She said that the Defendant was amenable to treatment and that he expressed a desire to change because he was "horrified" by his behavior. She said the Defendant understood that child pornography was child abuse. She said the Defendant attended individual therapy sessions, but she agreed that group counseling was recommended to treat persons who had sexually exploited minors.

On cross-examination, Ms. Barker testified that she was approved by the State and the Board of Probation and Parole to provide treatment to sex offenders. She said she met with the Defendant twice in December 2008. She agreed that the tests she administered were suggested but not required and that the tests were commonly used to evaluate sex offenders. Although the Defendant was not diagnosed with paraphilia, she said the use of child pornography is "always deviant." She said the Defendant informed her that in April 2005, he touched the penis of his ex-girlfriend's five-year-old son. She said the incident with the child was also deviant behavior.

Ms. Barker testified that the Defendant was a low risk to re-offend if he continued to receive treatment, but she said that the Defendant's risk factors would be different if he had not been caught. She agreed that the Defendant began attending therapy after being charged with possession of pornographic materials and that he initiated the treatment. She suggested that the Defendant be required to attend group therapy and individual therapy sessions, that he not be around children without adult supervision, and that he not use the Internet except for work-related purposes.

David Carter testified that he was employed by the Board of Probation and Parole and that he prepared the Defendant's presentence report. He said he met with the Defendant and spoke with investigators before completing the report. He said the Defendant was required to register as a sex offender as a result of his guilty plea. He said there were no additional conditions placed on the Defendant before sentencing.

On cross-examination, Mr. Carter testified that the Defendant was cooperative and that he promptly provided all information requested during his investigation. He said that when he met with the Defendant in November 2008, the Defendant was employed with ComAir. He said he spoke with the Defendant's supervisor at ComAir, who informed him that the Defendant was an exceptional employee.

Blount County Sheriff's Detective Jim Widener testified that he interviewed the Defendant on December 20, 2006. He said that the interview was recorded and that they discussed allegations that the Defendant touched a five-year-old boy's penis. He said the Defendant initially denied the allegations but ultimately admitted that he touched the boy's penis. He said the Defendant also told him that he had a sexual encounter with his adopted aunt when the Defendant was a child.

On cross-examination, Detective Widener testified that the Defendant was very cooperative during the interview. He agreed that the Defendant signed two consent forms before being interviewed. He also agreed the Defendant described only one sexual act with the five-year-old boy.

Special Investigator Kelly Hoard testified that he worked with the Blount County Sheriff's High-Tech Evidence and Technology Unit. He said he was led to the Defendant as a result of the Defendant's use of peer-to-peer file sharing software. He said that he went to the Defendant's home on December 18, 2006, and that the Defendant consented to a search of his computer. He said the Defendant told him that he would find child pornography on the computer. He said that the Defendant's computer contained fifty-nine videos and 1,322 images depicting young females and agreed that more than 100 images "clearly appear[ed] to be child abuse images."

Special Investigator Hoard testified that he and Detective Chris Sanders interviewed the Defendant on December 19, 2006. He said the Defendant admitted he had been collecting child pornography for about one and one-half years. He said the Defendant was familiar with search terms used to find child pornography on the Internet. He said the Defendant stated that he deleted his collection of child pornography when he began dating his ex-girlfriend, the mother of the five-year-old boy, but that he resumed collecting the material from "child modeling sites." He said the Defendant stated that persons using the sites had been arrested for possessing and producing child pornography. He said the Defendant stated that he masturbated to some of the videos and that he enjoyed watching videos from the "Vicky series" and a video of a young Filipino girl. He said the "Vicky series" were videos of an eight-year-old girl being sexually assaulted by her father. Special Investigator Hoard played the videos for the trial judge, and the judge stated, "I can tell the age of that girl and I don't want to see any more of it."

Special Investigator Hoard testified that the Defendant told him about an incident with a five-year-old boy. He said the Defendant stated that the boy undressed as they were playing a video game and that the boy pulled a blanket over their heads. He said the Defendant told him the boy stated that they were going to play the "cave game," which involved touching "pee-pees." He said the Defendant initially stated that he did not touch the boy's penis and that he told the boy to put on his clothes.

On cross-examination, Special Investigator Hoard testified that Special Investigator Martin Elder searched the Defendant's computer and compiled the forensics report detailing the contents of the computer. He agreed that he did not search the computer and that he did not have firsthand knowledge of its contents. He said the forensics report indicated that over 100 of the images found on the Defendant's computer were of girls under the age of eighteen and were considered child pornography. He said that several of the videos on the Defendant's computer, including the "Vicky series," had been encountered in previous investigations and were considered child pornography.

Stephen Vincent Parks testified that he was the Defendant's father. He said he told the Defendant to be honest with the police and to seek treatment for his problems. He said that the Defendant worked for ComAir before being arrested but that the Defendant was fired after pleading guilty to sexual exploitation of a minor. He said the Defendant briefly worked for Underground Technologies but was fired after the company performed a background check.

Mr. Parks testified that the Defendant moved into his house after being arrested and that the Defendant continued to live with him at the time of the sentencing hearing. He said he required the Defendant to tell him where the Defendant went and what the Defendant did

4

at all times. He said the Defendant did not drink alcohol or use illegal drugs. He agreed he had Internet access and a firearm at his house, but he said he was able to monitor the Defendant's computer use and would ensure that the Defendant did not have access to the firearm. He said he would also ensure that the Defendant attended counseling sessions. He said the Defendant had a car and would be able to visit a probation officer if ordered to do so. He said that the Defendant was a good man and that the Defendant could become a productive citizen once again if he received help.

Mr. Parks agreed that the Defendant had a sexual encounter with a twelve-year-old adopted aunt when the Defendant was seven years old but said that he was not aware of it until the Defendant was arrested and told him. He said the Defendant told him that his aunt forced him to "put his thing inside her." He said he knew that the Defendant had a sexual encounter with a five-year-old boy before the Defendant was arrested because the Defendant and the boy's mother told him.

On cross-examination, Mr. Parks testified that the Defendant regularly used the Internet to play games. He was not aware that the Defendant hid child pornography in a subdirectory of a game on the Defendant's computer. He agreed that he would not know if the Defendant stored child pornography on his computer. He agreed that he worked twenty-four hour shifts as a public safety officer at McGhee-Tyson Airport and that there were days when the Defendant was left unattended.

On redirect examination, Mr. Parks testified that he would not be opposed to officers inspecting his computer to see if it contained child pornography. He said that officers would not need to call ahead of time and that they could come to his home whenever they wished.

Priscilla Dettmer testified that she was a captain with the Airport Safety Department and that she was Mr. Parks's boss. She said she had known Mr. Parks and his family for twenty-five years. She said that she could say "nothing but good things" about the Defendant and that the Defendant was welcome in her home anytime. She said she was shocked when the Defendant was arrested. She said that Mr. Parks was very reliable and agreed that Mr. Parks would be able to monitor the Defendant if he received probation. She said the Defendant would be able to comply with any demands placed on him if he received probation.

On cross-examination, Captain Dettmer testified that although she did not have children, she would welcome the Defendant into her home even if she did. She said that if she had a young child, she would allow the Defendant to have unsupervised contact with the child because the Defendant had sought counseling and wanted to resolve his problems. She acknowledged that the Defendant sought counseling after being arrested, not before. She

said that she was aware of the Defendant's child pornography collection and the encounter he had with a five-year-old boy and agreed that this knowledge did not change her assessment of the Defendant.

Vicki Parks testified that she was the Defendant's mother and that she was stunned when he was arrested. She said she would do whatever was necessary to help her son resolve his problems. She said that she attended one therapy session with her son and that he described his crime to her during the session. She said that when the Defendant was a child, a neighborhood boy pulled the Defendant into a closet and exposed himself to the Defendant. She said that the Defendant told her about the incident and that they avoided the other boy. She said she did not know if the Defendant sought treatment before he was arrested. She agreed the Defendant would be able to comply with any restrictions placed on him if he received probation. She said that the arrest changed the Defendant's life completely and that the Defendant "would never go to that edge again."

On cross-examination, Ms. Parks agreed that the Defendant told her during a therapy session that he possessed images involving young children and sexual activity. She agreed the Defendant did not tell her that some of the children in the images were as young as seven or eight years old.

The Defendant testified that at the time of the sentencing hearing, he lived at his father's home with his sister and stepmother. He said his sister did not have any children. He said that when he was about five years old, a boy from his neighborhood took off his pants and pulled the Defendant into a closet. He said that the boy placed his penis in the Defendant's mouth and urinated.

The Defendant testified that when he was seven, he had a sexual encounter with his twelve-year-old adopted aunt. He said she told him that she wanted to teach him how to have sex. He said the sexual contact felt good and aroused him. He said the encounter did not feel wrong at the time. He said his brother and his uncle saw the encounter but did not tell anyone. He said that his brother was eighteen months older than him and that his uncle was three and one-half years older than him. He said he did not tell his parents about the encounter until after he was arrested.

The Defendant testified that in February or April 2006, he babysat his ex-girlfriend's son. He said that he and the child were playing video games when the child took off his clothes. He said this was not unusual because his ex-girlfriend allowed her son to "run around like that all the time." He said the child threw a blanket over their heads and explained that they would play the "cave" game. He said the child told him that he played the cave game with his friend and his father and that the game involved touching "butts" and

6

"pee-pees." The Defendant said he noticed that the child had an erection. He said he tapped the child's penis and asked the child "what that was about." He said the child sat in his lap and moved back and forth. He said that he began to "freak out" and that he dressed the child and put him to bed. He said he did not immediately tell his ex-girlfriend about the incident or what the child told him because the child had a tendency to lie. The Defendant said that the child subsequently told his mother he had put his penis in the Defendant's mouth but that the child eventually admitted he lied. He said the child also admitted that he did not play the cave game with his father. He said that the Department of Children's Services investigated the incident but that they did not contact him. He said this was the only incident to occur between himself and the child.

The Defendant testified that at the time of his arrest, he lived with his ex-girlfriend. He said that on December 18, 2006, he received a telephone call from his ex-girlfriend informing him that the police were at their home to investigate complaints that the Defendant was stealing wireless Internet signals. He said he returned home from work and was confronted by Special Investigator Hoard and Detective Chris Sanders. He said Special Investigator Hoard informed him that the police investigated his internet use and determined that he downloaded child pornography using a peer-to-peer file sharing program. He said he consented to a search of his computer and allowed the police to take his computer. He said Special Investigator Hoard called him the next day and requested that he come to the police station to make a statement. He said he had a long conversation with the detectives after they read his Miranda rights. He said he spent the night in jail and was interviewed by Detective Widener the next day. He said he was terrified and suicidal during the interview. He said that although he told the detectives that his encounter with the five-year-old boy made him feel "tingly" and "naughty," he did not understand what he felt at the time of the interview. He said his therapy sessions helped him to understand that what he actually felt was embarrassment and regret.

The Defendant testified that he began seeing Betsy Deeter, a therapist, shortly after his arrest. He said he sought therapy on his own initiative and was not ordered to attend therapy. He agreed that he visited Ms. Deeter more than thirty-seven times for individual counseling sessions but said that he stopped seeing her because he could not afford to pay for the sessions after he lost his job and health insurance coverage. He said that he did not attend group therapy sessions but that he was willing to continue individual or group therapy. He said he was confident that he could pay for and find transportation to attend therapy sessions.

The Defendant testified that he began viewing child pornography by accident. He said he was downloading adult pornography and downloaded a video containing girls that appeared to be twelve or thirteen years old having sex with an older man. He said that after

7

viewing the video, "a spark went off in [his] head" and he "felt like [he] had to have more." He said the initial video made him feel as if he went back in time to the point when he was seven and had sex with his twelve-year-old aunt. He said he then intentionally sought child pornography. He said that at the time, he viewed the child pornography as if it were adult pornography. He said that he would concentrate on the young girls' faces, "which seemed happy," and that he thought the girls were aroused and enjoying it. He said that after attending therapy, he realized that the videos were "horrible" and ruined the young girls' lives. He said that he lost his innocence at a young age and that he did not want to see that happen to other children.

The Defendant testified that at the time of his arrest, he had worked for ComAir Airlines for nearly three years. He said he was fired in January 2009. He said that he found new employment with a utility company and a bank, but that he was fired from each job after his employer performed a background check and discovered that he was a registered sex offender.

The Defendant testified that he lived at his father's home but that he often spent the weekend at his current girlfriend's house. He agreed that his girlfriend did not have children but that she did have a niece. He said that he had no unsupervised contact with children after his arrest and that he would comply with any court order restricting him from unsupervised interaction with children.

The Defendant testified that after he entered his guilty plea, he was immediately placed on the Sex Offender Registry. He said that Officer Suzie Miller monitored his conduct for the Sex Offender Registry and that he reported to her every three months. He said he was not allowed to be around children without adult supervision or spend the night in the same home as a child. He said he was also required to inform Officer Miller of any major changes in his life, such as changing jobs or addresses. He said he had not violated any of these requirements.

The Defendant testified that he informed family, friends, and co-workers of his problems and identified exhibits containing numerous letters written by these persons on his behalf. He said that his arrest had a large impact on his life and that he could not explain how bad he felt. He said that this was his first criminal conviction and that he did not have a problem with alcohol or drugs. He said he was confident that he could obtain employment if allowed to do so by the court. He said he was willing to comply with all conditions imposed on him if he received diversion or probation, including living at his father's house, reporting to a probation officer, attending group counseling, not using the Internet, and allowing random searches of his computer.

8

On cross-examination, the Defendant testified that the incident with his adopted aunt was linked to his use of child pornography. He agreed that although he did not intentionally download his first child pornography video, he quickly learned how to acquire child pornography by using specific search terms. He agreed he could tell that the girl in the "Vicky series" was a child. He said that he did not realize at the time that the girls were being raped but that he now knew it was rape. He said that before he was arrested, he did not think about whether the videos were wrong or right, but he agreed that he hid the videos on his computer. He said he deleted his first collection of child pornography because he did not think he "needed it anymore," not because he thought it was wrong. He agreed he knew the videos were wrong after being arrested.

The Defendant agreed that he told the detectives he enjoyed videos from the "Vicky series" and a video of a young Filipino girl. He agreed he thought the Filipino girl appeared to be happy in the video. He did not agree that his pornography collection contained images of children as young as two years old, but he said that his collection contained images of young children. He agreed that he initially asked investigators not to inform his ex-girlfriend why his computer was seized and that he did not tell her about the incident with her son until after she learned about it from her son. He said that during the interview with the detectives, he could not remember if he initially denied touching the five-year-old boy's penis.

The trial court ordered that all computers in the Defendant's home be searched before sentencing the Defendant. The Defendant, his father, and his stepmother consented to the search of their computers. After the search was conducted, the State informed the trial court that a computer in the Defendant's bedroom had been recently used to access adult pornographic websites but not child pornographic websites.

The Defendant testified that he used his computer to access adult pornographic websites but did not download any material from the websites. On cross-examination, the Defendant agreed that he had used the Internet and visited adult pornography websites after entering his guilty plea. He said he was never told not to use the Internet or visit adult websites.

The trial court found that enhancement factor (1) applied due to the Defendant's first collection of child pornography that he deleted and due to his inappropriate touching of the five-year-old boy. See T.C.A. § 40-35-114(1) (2010) (the Defendant had a previous history of criminal behavior). The court found no mitigating factors applicable.

The trial court denied judicial diversion but found that an alternative sentence was appropriate based on the conclusion of the Defendant's therapist, Ms. Deeter, that the Defendant was not a danger to children. The court found that a sentence of full probation

would unduly depreciate the seriousness of the offense and that the circumstances of the offense were "heinous."

The Defendant was sentenced as a Range I, standard offender to four years' confinement, with six months to be served in the Blount County Jail and the remainder to be served on supervised probation. As a condition of his probation, the court ordered the Defendant to undergo an additional psychosexual evaluation performed by Nan Butruff using a penile plethysmograph and a polygraph and to comply with any treatment recommendations. The court also ordered that the Defendant not be around children without supervision by adults aware of his offense and that the Defendant not use the Internet except for employment or school purposes. This appeal followed.

# I

The Defendant contends that the trial court erred during sentencing by denying judicial diversion. He argues that the court's reliance on the "repulsive" nature of the images contained on his computer was arbitrary because the nature of his offense is inherently repulsive. He also argues that the court improperly considered his continued use of adult pornography and arbitrarily concluded that Ms. Barker did not do everything she should have done to be able to formulate an opinion regarding the Defendant's amenability to correction. Lastly, the Defendant argues that the trial court ignored factors in favor of diversion. The State contends that the trial court properly denied judicial diversion after considering the required factors. We agree with the State.

A defendant is eligible for judicial diversion if he or she is found guilty of or pleads guilty or nolo contendere to a Class C, D, or E felony or a lesser crime, has not previously been convicted of a felony or a Class A misdemeanor, and is not seeking deferral for a sexual offense. See T.C.A. § 40-35-313(a)(1)(B)(i) (2006) (amended 2007). At the time of the Defendant's offense, sexual exploitation of a minor was not considered a sexual offense that would bar eligibility for judicial diversion. See id.

Judicial diversion allows the trial court to defer further proceedings without entering a judgment of guilt and to place the defendant on probation under reasonable conditions. T.C.A. § 40-35-313(a)(1)(A). When the probationary period expires, if the defendant has completed probation successfully, the trial court will dismiss the proceedings against the defendant with no adjudication of guilt. See T.C.A. § 40-35-313(a)(2). The defendant may then apply to have all records of the proceedings expunged from the official records. See T.C.A. § 40-35-313(b). A person granted judicial diversion is not convicted of an offense because a judgment of guilt is never entered. See T.C.A. § 40-35-313(a)(1)(A).

The decision to grant judicial diversion lies within the sound discretion of the trial court, and this court will not disturb that decision on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Upon review, we will give the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 353, 356 (Tenn. 1983)).

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice. Electroplating, 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. If the trial court refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." Parker, 932 S.W.2d at 958-59.

Before denying judicial diversion, the trial court stated that the circumstances of the offense weighed heavily against granting judicial diversion and that the images contained on the Defendant's computer were repulsive and shocking. The court noted that the Defendant did not view the images as rape or think they were wrong. The court also noted the Defendant said that he was sexually excited by the images and that the children in the images appeared to be happy.

The trial court stated that it had concerns about the Defendant's amenability to correction and his ability to be rehabilitated. It noted that although Ms. Barker was qualified to render an opinion and concluded that the Defendant was at a low risk to re-offend, she "perhaps" did not do everything she should have done to be able to formulate an opinion. The court was also concerned that the Defendant viewed adult pornography after his arrest and noted that the Defendant began downloading child pornography while searching for adult material. Notwithstanding its concerns, the trial court said it could not conclude that the Defendant was not amenable to correction. The trial court noted that the Defendant's therapist concluded the Defendant was not a danger to children.

The trial court stated that it considered the Defendant's social history and the sexual incident he had with his ex-girlfriend's five-year-old son. The court stated that the Defendant's lack of a criminal record weighed in favor of granting judicial diversion. The court noted its consideration of the Defendant's physical and mental health and the deterrence value to the Defendant and others, but it stated that no proof was presented as to the deterrence value. The court concluded that in light of its findings regarding the

11

circumstances of the offense and its uncertainty of the Defendant's amenability to correction, judicial diversion would not serve the interest of the Defendant or the public.

With regard to the Defendant's claim that the trial court arbitrarily considered his continued use of adult pornography after being arrested, this evidence was relevant to determine the Defendant's amenability to correction because the Defendant testified that he began downloading child pornography while searching for adult pornography. With regard to the trial court's consideration of Ms. Barker's testimony, it did not arbitrarily conclude that she "perhaps" did not do everything she should have done to be able to formulate an opinion. She testified that she did not use a polygraph or a penile plethysmograph to evaluate the Defendant and agreed that some members of the Tennessee Sex Offender Board recommended the use of the plethysmograph to evaluate a patient.

The record reflects that the trial court reviewed each of the required factors and found that diversion was not appropriate in this case. The record contains substantial evidence to support the trial court's determination. Although the nature of the Defendant's offense may be inherently repulsive, as the Defendant argues, the record reflects that the Defendant's computer contained over 100 instances of child pornography, including videos depicting the rape of a child by her father. Furthermore, the Defendant's social history reflects that he had a sexual encounter with his ex-girlfriend's five-year-old son. We hold that the trial court did not abuse its discretion by denying judicial diversion.

## II

The Defendant contends that the trial court erred during sentencing by imposing the maximum sentence in the range and ordering confinement. He argues that the trial court erred in determining that he had a history of criminal behavior and that the trial court failed to apply mitigating factors supported by the evidence. He also argues that the trial court arbitrarily found that confinement was necessary to avoid depreciating the seriousness of the offense. The State contends that the trial court properly sentenced the Defendant after considering all relevant factors. We hold that although the trial court erred in failing to apply two mitigating factors, the Defendant's sentence was not excessive.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb

the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

13

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

The Defendant argues that the trial court erred in determining that he had a history of criminal behavior because there was no evidence to establish his criminal behavior other than his own admissions at the sentencing hearing. The trial court found that enhancement factor (1) applied, that the Defendant had a previous history of criminal behavior, after the Defendant testified that he touched the penis of his ex-girlfriend's five-year-old son and admitted that he had a previous collection of child pornography that he deleted. This court has previously concluded that a trial judge may find evidence of criminal behavior even though there has been no conviction. See State v. Massey, 757 S.W.2d 350, 352 (Tenn. Crim. App. 1988). When imposing a sentence and determining the application of enhancement factors, a trial court may properly consider prior criminal behavior admitted by a defendant. See State v. Gomez, 239 S.W.3d 733, 742 (Tenn. 2007). We hold that the record supports the trial court's finding of prior criminal behavior and its application of enhancement factor (1).

The Defendant argues that the trial court failed to apply mitigating factors (1) and (13) because his behavior neither caused nor threatened serious bodily injury and he was cooperative throughout the investigation. See T.C.A. § 40-35-113(1), (13) (2010). The record reflects that although the trial court found no mitigating factors applicable, it failed to state what mitigating factors, if any, it considered. See T.C.A. § 40-35-210(e) ("When the court imposes a sentence, it shall place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.").

With regard to the lack of serious bodily injury, we note that mitigating factor (1) can be properly considered and applied when sentencing a defendant for crimes involving the sexual exploitation of a minor. See State v. Kelly Michael Pickett, No. M2004-00732-CCA-R3-CD, Davidson County (Tenn. Crim. App. Oct. 3, 2005); State v. John Ray Thompson, Nos. M2003-00487-CCA-R3-CD, M2003-01824-CCA-R3-CD, Bedford County (Tenn. Crim. App. Dec. 20, 2004). At the sentencing hearing, no evidence was presented suggesting that the Defendant created or participated in the child pornography found on his computer, that he instructed others to create the material, or that anyone was injured as a direct result of the Defendant downloading the material. We conclude that the record supports application of mitigating factor (1).

14

With regard to the Defendant's cooperation, we note that cooperation with the police is a proper basis for application of mitigating factor (13). See State v. Tammy R. Flatt, No. M2008-01959-CCA-R3-CD, Wilson County, slip op. at 19 (Tenn. Crim. App. Dec. 2, 2009). At the sentencing hearing, Mr. Carter testified that the Defendant was cooperative and that the Defendant promptly provided all information requested during his investigation. Detective Widener testified that the Defendant was very cooperative during their interview. Special Investigator Hoard testified that the Defendant consented to a search of his computer and informed him that child pornography was on the computer. We conclude that the record supports application of mitigating factor (13).

With regard to the trial court's ordering six months' confinement in the Blount County Jail, when determining if incarceration is appropriate, we note that a trial court should consider if:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

In determining that six months' confinement in the Blount County Jail was appropriate, the trial court found that a sentence of full probation would unduly depreciate the seriousness of the offense and that the circumstances of the offense were "heinous." If the seriousness of the offense is the basis for the denial of full probation, the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement. State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App.1991) (citing State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985)).

Although the Defendant does not have a long history of criminal conduct and less restrictive measures than confinement have not been applied to the Defendant, the nature of the Defendant's offense outweighs factors in favor of full probation and supports the trial

15

court's determination that six months' incarceration was appropriate. The record reflects that the materials found on the Defendant's computer were especially shocking and included videos depicting the rape of a child by her father. The Defendant has not shown that the trial court erred in determining the manner of his sentence.

Taking into account the trial court's failure to consider mitigating factors (1) and (13), we must consider the length of the sentence imposed. The sentencing range for a Range I offender convicted of a Class D felony is not less than two nor more than four years. T.C.A. § 40-35-112 (2010). Enhancement factor (1) should be afforded significant weight because the Defendant admitted touching the penis of a five-year-old child, which could constitute aggravated sexual battery, a Class B felony carrying a possible sentence of not less than eight nor more than twelve years. See id.; T.C.A. § 39-13-504 (2010). Upon review, we conclude that the significant weight of enhancement factor (1), even when considered in light of the mitigating proof, supports a sentence of four years' confinement, with six months to be served in the Blount County Jail and the remainder to be served on supervised probation with special conditions consistent with this opinion.

### III

The Defendant contends that the trial court erred during sentencing by imposing unreasonable terms of probation. He argues that the conditions imposing limited Internet use and an additional psychosexual evaluation using a penile plethysmograph are not reasonably related to his sentence or rehabilitation. The State contends that these conditions are reasonable given the circumstances of the offense, the Defendant's admission of a sexual incident involving a five-year-old boy, and his continued viewing of pornography on the Internet. We hold that although a restriction on Internet use is an appropriate condition of the Defendant's probation, the condition requiring an additional psychosexual evaluation is not justified.

After determining that probation is justified under the circumstances, "the conditions imposed must be reasonable and realistic and must not be so stringent as to be harsh, oppressive or palpably unjust." Stiller v. State, 516 S.W.2d 617, 620 (Tenn. 1974). A defendant can be ordered to comply with conditions of probation that are "reasonably related to the purpose of the offender's sentence and not unduly restrictive of the offender's liberty, or incompatible with the offender's freedom of conscience." T.C.A. § 40-35-303(d)(9) (2006) (amended 2007, 2009, 2010).

Tennessee Code Annotated section 39-13-705(a) provides that a convicted sex offender seeking probation or alternative sentencing must submit to a psychosexual evaluation to determine the offender's risk of re-offending, the potential for treatment, and

16

a treatment plan and procedures for monitoring the offender's behavior. The Defendant is responsible for paying the cost of the evaluation, subject to his ability to pay. T.C.A. § 39-12-705(c) (2010). "If the court grants probation or alternative sentencing, any plan of treatment recommended by the evaluation shall be a condition of the probation or alternative sentencing." T.C.A. § 39-12-705(b).

With regard to the condition that the Defendant not use the Internet except for employment or school purposes, we hold that this is a reasonable condition of probation. After performing a psychosexual evaluation of the Defendant, Ms. Barker recommended that as part of his treatment, the Defendant should not use the Internet except for work-related purposes. Furthermore, the Defendant's conviction is due to his improper use of the Internet to download child pornography. A restriction permitting use of the Internet only for employment or school-related purposes is reasonably related to the Defendant's sentence and not unduly restrictive of his liberty.

With regard to the condition ordering the Defendant to undergo an additional psychosexual evaluation performed by Nan Butruff using a penile plethysmograph and a polygraph, we hold that this is an unreasonable condition of probation. Our courts have repeatedly held that the primary goal of probation is rehabilitation of the defendant. See, e.g., State v. Burdin, 924 S.W.2d 82, 86-87 (Tenn. 1996). The Defendant has already complied with the mandates of Tennessee Code Annotated section 39-13-705 and undergone a psychosexual evaluation conducted by Ms. Barker, a senior psychological examiner approved by the Tennessee Sex Offender Treatment Board to treat patients. No evidence was presented suggesting that her evaluation was improper or that she was required to evaluate the Defendant using a plethysmograph or a polygraph. Furthermore, the Defendant sought on his own initiative to rehabilitate himself by attending counseling. Ms. Deeter concluded that as a result of that counseling, the Defendant took responsibility for his behavior, showed "deep remorse," and developed "a good understanding of his participation in the abuse of children through the pornography." Nothing in the record supports the trial court's determination that an additional psychosexual evaluation would add to the rehabilitation of the Defendant.

In consideration of the foregoing and the record as a whole, the conviction and the length of the sentence are affirmed, but we modify the special conditions of the Defendant's probation to remove the need for additional psychosexual evaluation at this time.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE

17